DONALD C. ROACH AND ALVERDA C. ROACH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roach v. Commissioner
Docket Nos. 8340-87; 17974-87
United States Tax Court
T.C. Memo 1989-586; 1989 Tax Ct. Memo LEXIS 588; 58 T.C.M. (CCH) 545; T.C.M. (RIA) 89586; October 30, 1989
Patrick H. Vane, for the petitioners. Blake W. Ferguson, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions *589 to petitioners' Federal income taxes for 1982 and 1983 as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6659
6661
6621(c)
1982
$ 46,967
$ 2,348.00
*
$ 14,090
$ 11,742 **
1983
10,356
517.80
*
3,106
2,589 **
Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are whether petitioners are (1) entitled to deduct energy conservation losses sustained in connection with the purchase of an electronic energy management device; (2) entitled to investment tax credits and business energy credits on the energy management device; (3) liable for additions to tax under section 6653(a); (4) liable for additions to tax under section 6659, or, in the alternative, section 6661; and (5) liable for additional *590 interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners resided in Anchorage, Alaska, at the time they filed their petition. Petitioner Donald Roach (petitioner) received his Bachelor of Science degree in Industrial Engineering from Montana State University in 1964 and his Masters of Business Administration degree from West Virginia University in 1969. Alverda C. Roach is a registered nurse. Prior to 1980, petitioner performed strategic planning, forecasting, and budgeting tasks for six mines and four mills as division vice president of UNC Resources, Inc., an Albuquerque, New Mexico, uranium and milling concern. During the years in issue, petitioner was employed as Director of Administrative Planning for Arco Gas and Oil's Prudhoe Bay, Alaska, oil production facility expansion project. Petitioner was responsible for the administration of $ 70 million of the $ 500 million Prudhoe Bay project budget. Petitioner never purchased an energy management system or device in connection with his employment or his duties as an employee. Prior *591 to 1982, petitioner considered various real estate investments in anticipation of the possible cessation of his employment on the Prudhoe Bay project. Petitioner learned about the Pacific Energy Control Corporation (PECC) energy management system through the solicitations of Jake Garret, an employee of PECC. On August 31, 1982, petitioner purchased a PECC device, the Solidyne 8000A, for a total price of $ 209,950. In connection with his purchase of the PECC device, petitioner read an engineering report prepared by Nicholas Arteca, a tax opinion prepared by Allen P. Essner (Essner), and profit and loss forecasts, all of which were provided to petitioner by PECC. The tax opinion prepared by Essner assumed that the purchaser would receive an appraisal that would state that the fair market value should at least equal the purchase price. It then specifically addressed the potential for challenge of the claimed valuation as follows: You should be aware, however, that no assurance can be given that the Service will not challenge the appraisal received by the taxpayer and attempt to ascribe a substantially lower value to the Energy System. Should the Service succeed in its contention *592 that the fair market value of the Energy System is less than the purchase price therefor, the amount of the taxpayer's depreciation deductions and investment tax credit will be proportionately reduced. Moreover, ERTA has enacted penalty provisions relating to the overvaluation of property which may adversely affect the taxpayer in this situation. * * *
Petitioner also used his engineering and financial knowledge to prepare profit and loss forecasts prior to making his decision to purchase the Solidyne 8000A. Petitioner's own 10-year cash flow analysis, which assumed an investment of $ 202,950 in the PECC device, reflected a net loss for each of the projected years. Petitioner did not negotiate the price he paid for the PECC device, nor did he investigate the price of similar models offered for sale by the manufacturer of his device or by competing manufacturers. The Solidyne Corporation price sheet listed the Model 8000A at an "end user price" of $ 1,600 in November of 1981. The "end user price" is also known as the "trade price," and an "end user" may be any person who wishes to purchase an energy management device from a local Solidyne representative. Petitioner was unaware *593 of who owned the Solidyne 8000A or the price paid for the device prior to his purchase. Petitioner signed an installment sales and service agreement with PECC on August 31, 1982. The terms of the agreement provided for a purchase price of $ 167,960 and a service cost of an additional $ 41,990. Upon the execution of the agreement, petitioner paid PECC the initial installment of $ 18,000; he paid another $ 6,600 at closing. The remainder of the purchase price was to be paid by a 12-percent note in the principal amount of $ 12,300 (Note I), due February 1, 1983, and a 9-percent note in the principal amount of $ 173,050 (Note II). The terms of Note II called for repayment in quarterly installments equal to the product of 55 percent of the net income realized by petitioner from energy cash savings shared with the end users, after reduction in the amount of 10 percent of the savings, which was to be provided to the management company. Petitioner was not required to submit a credit report or have his credit rating checked and verified prior to purchasing the PECC device and signing the promissory notes. Petitioner did not pay Note I on the due date or at all. PECC did not attempt *594 to enforce their rights as creditors upon petitioner's default on Note I. PECC canceled or forgave Note II in 1984. Petitioner, through PECC, originally contracted with Control Technology, Inc. (CTI) to perform the management services associated with the Solidyne 8000A. The terms of the agreement provided that CTI would supervise the installation as well as provide maintenance, inspection, managerial, and administrative services in connection with the Solidyne 8000A. In addition, CTI was to prepare copies of monthly fuel bills and other related fuel costs or expenses that would affect the determination of the "shared savings" to determine the amount of such savings on a quarterly basis. In exchange for the outlined services provided to petitioner, CTI was to receive a maintenance and service fee equal to 10 percent of petitioner's interest in the "shared savings." "Shared savings" was defined as the total amount of all reduced energy charges realized by the end user as a result of the installation of the Solidyne 8000A. Petitioner relied upon PECC or its affiliate, CTI, to determine the location at which the Solidyne 8000A would be installed. Petitioner's Solidyne 8000A was *595 initially installed in September 1982 at the Lamps of China restaurant in Brooklyn, New York. Petitioner's first attempt to confirm that the energy device had been put in service was by letter dated September 1983. As a result of the failure of the Lamps of China restaurant to produce their energy bills, petitioner, through Steven A. Nordyke, an attorney from Hawaii, requested removal of the energy device. In December 1983, CTI removed petitioner's energy device from the Lamps of China restaurant and modified it at an approximate cost to petitioner of $ 2,000. During 1984, petitioner changed management companies and contracted with Energy Systems by McGowans, Inc., a Florida corporation, to manage the energy device. The new management company contract was negotiated by Q Energy Associates, a PECC company formed for such ventures. In October or December 1984, petitioner's energy device was installed at DiMillo's restaurant in Portland, Maine. Petitioner's unit was removed from DiMillo's on September 26, 1985. Petitioner did not maintain a separate bank account for the operational expenses and revenues of the PECC device. As of February 9, 1989, petitioner's device had produced *596 no more than $ 981 in revenue. Petitioner made payments for liability insurance for the device for the period of July 6, 1983, through July 6, 1984, and property insurance for the period of March 7, 1983 through May 20, 1983. On their Federal income tax returns for 1982 and 1983, petitioners claimed Schedule C losses from their energy management system activity in the amounts of $ 27,696 and $ 42,393, respectively. Petitioners' income tax returns were prepared by an employee of PECC. On their returns for the years in issue, petitioners depreciated the energy management system based on 5-year accelerated cost recovery system percentages. In computing the depreciation, petitioners reported the initial basis of the PECC device as $ 167,960. Petitioners also claimed investment tax credits of $ 33,859 and $ 8 for 1982 and 1983, respectively. Petitioners computed their 1982 investment tax credit using a basis of $ 170,637 and the 1983 credit using a basis of $ 635. Petitioners also claimed a $ 564 deduction for insurance expenses in 1983. In the notice of deficiency, respondent disallowed the losses and investment tax credits and determined additions to tax and interest as previously *597 set forth. OPINION The primary issue for decision is whether petitioners are entitled to deductions and credits associated with their purchase of the Solidyne 8000A energy management system. Respondent asserts that petitioners were not engaged in a trade or business or in a transaction entered into for profit and consequently are not entitled to any of the claimed deductions or credits. Petitioners argue that they have demonstrated a clear profit objective through their continuous efforts to ensure that their energy management system was properly installed, managed, and maintained for maximum energy savings and profit. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a). Particularly with respect to deductions, they must bring themselves within the terms of the applicable statutes. Rockwell v. Commissioner, 512 F.2d 882, 885-886 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. Economic Substance
This case is factually similar to other cases recently decided by this Court in which deductions and credits related to energy management devices were disallowed. Soriano v. Commissioner, 90 T.C. 44 (1988); *598 Kennan v. Commissioner, T.C. Memo. 1989-300; Kaba v Commissioner, T.C. Memo. 1989-148. In those cases we analyzed the objective factors concerning the investments and concluded that the taxpayers' transactions therein lacked economic substance. We believe a similar analysis is appropriate in the present case. If we conclude that the transaction is devoid of economic substance, the transactions will be disregarded for Federal income tax purposes. See, e.g., Collins v. Commissioner, 857 F.2d 1383, 1385 (9th Cir. 1988); Sochin v. Commissioner, 843 F.2d 351, 353 (9th Cir. 1988). 1. Relationship Between Sales Price and Fair Market Value
Petitioner purchased the energy management device from PECC at a total cost of $ 209,950. The Solidyne Corporation price sheet, however, listed the Model 8000A at an "end user price" of $ 1,600 in November of 1981. Accordingly, the device petitioner purchased was available on the open market in 1982 at a cost of about $ 1,600. Petitioner did not present expert testimony on the fair market value of his energy device. He did, however, submit his own 10-year cash flow *599 analysis of the investment. This analysis, which assumed an investment in the PECC device of $ 202,950, projected a net loss for each year of the 10-year investment. Respondent's expert valued the energy device using a discounted cash flow analysis that appropriately disregards tax consequences. See Soriano v. Commissioner, 90 T.C. at 54-55. Under the discounted cash flow method, respondent's expert, in this case, used five factors to project the profitability of petitioner's investment as follows: 1. Terms of Agreement -- Any savings realized by the end user of the equipment were to be divided as follows: 50 percent to the end user; 10 percent to the service company for management; 40 percent was to be used as debt service on the $ 173,050 note, with payments first applied to reduce principal, then to accrued interest, with the remainder to the buyer who is responsible for other costs, such as insurance. 2. Anticipated Savings -- 10 percent. Savings estimates vary depending upon the facility; however, the average is projected between 5 percent and 12 percent, with a maximum of approximately 20 percent. 3. Useful Life -- 15 years. This is based on the *600 recognition that while a 25-year life is conceivable, there are a multitude of factors that tend to reduce the life of the subject equipment. 4. Energy Cost Growth -- 10 percent. This is a weighted average based on a July 1982 United States Department of Energy report. 5. Discount Rate -- 20 percent. This is the rate at which the future cash flow stream is discounted. It reflects the risk associated with the venture, as well as the expected return on investment. Twenty percent is the minimum rate of return. In the industry, a return on investment in 1 to 3 years is typical, resulting in a 30-percent return. Respondent's expert did not address a sixth factor, namely, the end user's minimum annual energy bill that would justify the use of the system. In Soriano v. Commissioner, supra, this factor was used by the expert in performing a similar profitability projection. 90 T.C. at 55
Based upon the foregoing assumptions, respondent's expert projected a negative discounted cash flow of $ 29,870. In other words, absent tax benefits, the purchase and operation of the PECC device would not be profitable. The findings of respondent's expert, *601 coupled with the gross disparity between the price paid by petitioner and the price at which the device was available for purchase on the open market, lead us to conclude that the purchase price in this transaction was grossly overstated. Similarly, in Soriano and the cases that followed, the exaggeration of value claimed for the energy management device was a major factor in concluding that the taxpayers were not entitled to their claimed deductions and credits. Soriano v. Commissioner, 90 T.C. at 57; Kennan v. Commissioner, T.C. Memo. 1989-300; Kaba v Commissioner, T.C. Memo. 1989-148. Soriano involved an individual who leased energy management devices through a partnership that then installed the devices and shared the energy savings with the end user. Soriano v. Commissioner, 90 T.C. at 45-48. We found that the terms of the lease transaction, when analogized to a purchase transaction, revealed a purported purchase price more than double the present value of the expected future income stream. Soriano v. Commissioner, 90 T.C. at 56. This finding, along with the taxpayers' failure to obtain *602 an independent appraisal of the energy management device and the gross disparity between the fair market value of the device and the "advance rentals" paid by taxpayer, led us to conclude that the terms of the transaction were greatly inflated. Soriano v. Commissioner, 90 T.C. at 57. Although Soriano involved a lease transaction, the features of the transactions in that case and the present case are too similar to distinguish among them. 2. Structure of the Financing
The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of the lack of economic substance. See, e.g., Tolwinsky v. Commissioner, 86 T.C. 1009 (1986); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); and see Knetsch v. United States, 364 U.S. 361 (1960); Karme v. Commissioner, 73 T.C. 1163, 1186-1187 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Golsen v. Commissioner, 54 T.C. 742, 753-754 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In the present case, the terms of the financing *603 for the purchase of the PECC device consisted of an initial cash down payment of $ 18,000, $ 6,600 paid at closing, and two promissory notes in the amounts of $ 12,300 (Note I) and $ 173,050 (Note II). Note I was a 12-percent full recourse note due February 1, 1983. Petitioner defaulted on Note I without reprisal from PECC. The terms of Note II called for repayment of principal and interest at 9 percent for an amount tied to the amount of energy savings realized by the end user. Energy savings revenues from the operation of petitioner's energy management device totaled $ 981. Note II was canceled or forgiven in 1984. As in Soriano, we conclude that the debt obligations that made up a majority of the purchase price of petitioner's PECC device were not realistic in relation to the value of the device. See Soriano v. Commissioner, 90 T.C. at 56-57. We also conclude that petitioner never anticipated having to satisfy Note II because the revenues from which Note II was to be paid were not likely to be received. These factors, and the failure of PECC to act upon petitioner's default on Note I, persuade us that the structure of the financing reveals a purchase *604 price that was not likely to be paid and cannot be recognized for tax purposes. 3. The Dealings Between PECC and Petitioner
Petitioner asserts that he carried on the energy management system activity in a businesslike manner, pointing to his computer cash flow analysis on the PECC device prior to his purchase. Petitioner's own 10-year cash flow analysis, however, reflects a net loss for each of the projected years. Facts that lead us to conclude that petitioner did not conduct his activities in a businesslike manner include: (1) that petitioner did not shop for other comparable energy management systems prior to this purchase; (2) that petitioner did not negotiate the price of the PECC device; (3) that petitioner did not know the price of similar competing models offered for sale; and (4) that petitioner did not investigate or negotiate the location where the PECC device was first installed. Although petitioner is educated and experienced in the energy field, he relied on the expertise of PECC's engineering and legal opinions rather than seeking independent advice; petitioner spent little time in the selection of CTI as his management company; petitioner's energy device *605 produced no more than $ 981 in revenue while producing losses totaling $ 70,089; and petitioner had substantial other income against which he could offset losses and investment credits generated by this energy investment. Petitioner's activities have not been shown to involve the time, effort, or expertise consonant with an actual and honest profit objective. 4. Congressional Intent
Congress created deductions and investment tax credits to encourage certain types of activities, and the taxpayers who engage in those activities are entitled to the attendant benefits. See, e.g., Leahy v. Commissioner, 87 T.C. 56, 73 (1986); Estate of Thomas v. Commissioner, 84 T.C. 412, 433-440 (1985). Activities, such as petitioner's energy management system activity, that have no practical economic effect other than the creation of income tax losses, are not consistent with congressional intent. The nature of the dealings between petitioner and PECC, the disparity between the purchase price and the fair market value of the device acquired by petitioner, and the illusory nature of the financing of the transaction convince us that petitioner's acquisition *606 of the energy management device from PECC is devoid of economic substance. The transaction, therefore, does not give rise to any deductions or credits. Additions to Tax
1. Section 6653(a)
Section 6653(a) provides a bifurcated addition to tax "if any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations." Petitioners initially contend that they are not liable for the additions to tax pursuant to section 6653(a) because: In order to raise a presumption of correctness, the Commissioner must have specified the taxpayers' acts of negligence upon which the Commissioner is basing the determination that the penalty applies. * * * Our determination here, however, is based on the evidence in the record and not on either side's failure of proof. The evidence of negligence is unpersuasive. Petitioner claimed substantial credits and deductions based solely on asset values provided by PECC. Petitioner is an engineer with a Masters of Business Administration degree. Despite his sophistication and background, petitioner made no effort to investigate PECC, the management companies employed for him by PECC, the fair market *607 value of the energy device, or comparable energy management devices. Further, petitioner relied on PECC-provided legal and engineering opinions for a purported investment in excess of $ 200,000. Petitioner did not seek an independent appraisal of the PECC device or an independent assessment of the venture. See Beck v. Commissioner, 85 T.C. 557, 577 (1985); Elliott v. Commissioner, 84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). Petitioner points out that he did perform a cash flow analysis of the PECC venture, but petitioner's own cash flow analysis revealed that the PECC device would not be profitable over a 10-year period. Further, the tax opinion provided for petitioner by PECC clearly illustrated the potential for dispute of the valuation by the Internal Revenue Service, placed petitioner on notice that some or all of the tax benefits of the transaction could be disallowed, and warned petitioner that additions to tax could be imposed. Petitioners claimed an inflated basis for depreciation, amortization, and credits on their 1982 and 1983 tax returns when minimal investigation would have *608 disclosed that the purchase price was inflated and that petitioners were not entitled to the deductions and credits. Petitioner's conduct and omissions thus justify the additions to tax for negligence. 2. Section 6659
Section 6659 imposes a graduated addition to tax on an underpayment "attributable to a valuation overstatement." Section 6659(c) provides that: there is a valuation overstatement if the value of any property, or the adjusted basis of any property claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be). A valuation overstatement of more than 250 percent of the correct valuation or adjusted basis results in the imposition of a 30-percent addition to tax. Section 6659(b). On their returns in issue, petitioners claimed an adjusted basis of $ 170,637 for their PECC energy management device. Because we have found that the transaction is devoid of economic substance and is to be disregarded for tax purposes, petitioners have no "adjusted basis" for depreciation or investment tax credit purposes. Their correct adjusted basis, therefore, is zero. See Zirker v. Commissioner, 87 T.C. 970, 978 (1986). *609 Petitioners' valuation overstatement is more than 250 percent of the correct valuation, and they are liable for the addition to tax under section 6659(b) in the amount of 30 percent of the underpayment attributable to the valuation overstatement. Petitioner asserts that the section 6659 addition to tax should not be applied to his case pursuant to the waiver provision of section 6659(e). Section 6659(e) provides that: The Secretary may waive all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith. Petitioner asks the Court to recognize his efforts in attempting to ascertain the value of the subject property. Petitioner asserts that reading the PECC-provided engineering reports, reading energy-related articles, and preparing his own cash flow analysis firmly establish a reasonable basis for the valuation and show that the claim was made in good faith. We decline to accept petitioner's assertions. Our factual findings preclude any conclusion that there was a reasonable basis for the valuation or adjusted *610 basis claimed by petitioners. 3. Section 6661
Section 6661 is applicable only to the amount by which the understatement exceeds the amount of the underpayment attributable to a valuation overstatement as determined under section 6659. Section 1.6661-2(f), Income Tax Regs. Based upon our foregoing analysis under section 6659, further discussion of section 6661 is unnecessary. 4. Section 6621(c)
Section 6621(c) provides for interest at the rate of 120 percent of the normal rate (under section 6601) with respect to any substantial underpayment attributable to a tax-motivated transaction. The term "tax-motivated transaction" includes any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(v). A transaction, such as petitioner's transaction with PECC, that lacks economic substance or business purpose is a sham transaction under section 6621(c)(3)(A)(v). Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. sub nom. without published opinion Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), *611 affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Petitioners are thus liable for additional interest as determined by respondent. Decisions will be entered for the respondent. Footnotes
*. 50 percent of the interest due on the deficiency for the year in issue. ** 120 percent of the interest accruing after December 31, 1984, on the entire underpayment of tax.↩